**Dr. Judith PLOTKIN, Plaintiff,**

v.

**Donna SHALALA, Secretary, Department of Health and Human Services, Defendant.**

**No. Civ.A. 98–1968(JR).**

United States District Court,
District of Columbia.

March 30, 2000.

Joseph M. DiJoseph, Ted Kavurkov, Vienna, VA, for plaintiff.

Marina Utgoff Braswell, Assistant U.S. Attorney, Washington, DC, for defendant.

### MEMORANDUM

ROBERTSON, District Judge.

Before the Court are cross-motions for summary judgment. A motions hearing was held on March 15, 2000. For the reasons set forth below, plaintiff's motion will be **denied** and defendant's motion will be **granted**.

### FACTS

Plaintiff Dr. Judith Plotkin brings this religious and disability discrimination action pursuant to 42 U.S.C. § 1981, Title VII, the Civil Rights Act of 1991, and the Rehabilitation Act of 1973.[1]

Plaintiff, a Ph.D. biogeneticist and statistician, was a probationary employee with the Administration of Child Services (ACS) of the Department of Health and Human Services from May 1, 1994 until February 1995. She alleges that she suffers from "multiple disabilities including a potentially life threatening tobacco product induced asthma [multiple chemical sensitivity (MCS) ] and a back condition which necessitated a spinal fusion that requires Plotkin to walk with a cane," Complaint at 2. These conditions, she asserts, qualify her as a disabled person under the Rehabilitation Act, Title VII, and the Americans with Disabilities Act.

Plaintiff alleges that, shortly after she began working at ACS, management ex-

---

1. She also brings a *Bivens* action, alleging that ACS management, in deciding not to make plaintiff a permanent employee, failed to provide plaintiff timely notice of the reasons for its decision and "did not use the objective standards for proper employee behavior that are found in the ACS personnel manuals," using instead "their own subjective judgment as to what was or was not proper behavior." Complaint at 4. This claim was neither briefed nor argued by the parties. On the basis of this Court's finding that plaintiff was properly terminated by defendant, and in the absence of factual support for plaintiff's claim, this claim is rejected.

hibited an unwillingness both to control smoking by fellow employees at the entrance of the building where she worked and to ensure that local hotels that hosted ACS business meetings made reasonable accommodations for her disabilities.

Defendant's version of the facts is that, within one month of her employment with ACS, plaintiff began to display an extraordinary pattern of inappropriate behavior:

- In June 1994, during an emergency evacuation of the building, plaintiff became involved in an altercation with a floor warden concerning her refusal to exit the building and follow the evacuation instructions, because, she maintained, she was physically unable to walk down seven flights of stairs as instructed. A few days after the incident, plaintiff's supervisor, Patrick Brannen, overheard plaintiff screaming at another employee regarding the evacuation incident and subsequently told plaintiff that her behavior was inappropriate.

- Two weeks after the evacuation, another agency employee filed a formal complaint with plaintiff's supervisor concerning an incident in which plaintiff allegedly demanded in an obstreperous manner that the employee, who was smoking on a sidewalk in front of the ACS building, move further away from the building. Mr. Brannen informed again plaintiff that her behavior was inappropriate, but he apparently attempted to address her concerns by notifying her that, if she arrived at work late to avoid the early-morning smokers on the sidewalk in front of the building, she would not be penalized.

- About a week later, plaintiff, while preparing for a meeting at a local hotel with the American Public Welfare Association (APWA), allegedly demanded of an APWA representative that the APWA ensure that all APWA-rented space, including the lobby and hallways, be smoke-free, and that the smoking ban be enforced. APWA filed a complaint about the aggressive manner in which plaintiff allegedly made her demands. Mr. Brannen once again spoke to plaintiff about her behavior, this time informing her that her attendance at the conference was not mandatory and that, if the hotel smoking policy were not acceptable to her, she could opt not to attend.

- The following month, an incident occurred in an employee lounge: a fellow employee had placed her food in a microwave oven to be heated, when plaintiff allegedly "shoved her aside, pushed her hand away and tried to unplug the microwave while yelling at [the employee] in a demeaning manner," Deft. Memorandum at 6, prompting the employee to summon security personnel; Mr. Brannen and another of plaintiff's superiors spoke to plaintiff about this incident and this time referred her to the Employee Assistance Program (EAP) to discuss any problems that might have been affecting her behavior.

- After her referral to EAP, plaintiff continued to have behavioral difficulties. She became involved in various altercations with other people using the agency fitness center. In October 1994, during an agency meeting, plaintiff went to the back of the room and demanded that a fellow employee give up his chair for her; when he refused, she pushed aside another employee as she exited the room. Plaintiff asserts that this dispute stemmed from a disagreement over what chair was required to accommodate her back ailment.

- Later that month, plaintiff allegedly called the sales representative for a Washington hotel about arrangements for an upcoming ACS meeting at the hotel. According to defendant, "plaintiff had called and been rude, loud and threatening, had demanded that the entire hotel be non-smoking, and had

threatened Ms. Da Silva with a law suit," Deft. Memorandum at 7.

- Finally, and perhaps most inexplicably, in December 1994, plaintiff was verbally abusive to an EEO officer who apparently was attempting to assist her with her problems.

Defendant further asserts that, on December 8, 1994, before the episode with the EEO officer, Mr. Brannen and his superior decided to terminate plaintiff— she was still a probationary employee at this point—based on their perception "that the agency was unable to continue employing plaintiff given her behavior, even though she was doing very good work." *Id.* They decided to wait a month to effect the termination because of the upcoming holiday season, and, on January 31, 1995, Mr. Brannen informed plaintiff by letter that she was being terminated during her probationary period, effective February 14, 1995.

In December 1994, before she learned that she would be terminated, plaintiff, who is Jewish, complained to ACS management about "the display of Christian Christmas decorations in the ACS offices," Complaint at 3. That complaint, according to plaintiff, was "deemed by her supervisors and the managers of the ACS to be yet another example of her uncooperativeness and abrasiveness," *id.*, and plaintiff asserts that it was one of the reasons for her termination.

Plaintiff has exhausted her administrative remedies. She filed timely complaints with the Equal Employment Office ("EEO") based on disability and religion. After a hearing, an Administrative Law Judge ruled against plaintiff. The Agency accepted the Administrative Law Judge's decision, and plaintiff received notification of the Agency's Final Decision on May 16, 1998.

## ANALYSIS

The allocation of the burden of proof in Rehabilitation Act cases in which an employer denies making an employment decision because of plaintiff's alleged disability follows the *McDonnell Douglas* burden-shifting approach. *See Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993) (citing *Doe v. New York Univ.*, 666 F.2d 761, 776 (2d Cir.1981)).

*Prima facie Case—Disability Claim*

■ Plaintiff has been challenged by defendant's motion to establish a *prima facie* case of disability discrimination, but she has failed to do so. The Court will assume *arguendo* that MCS is a disability under the Rehabilitation Act.[2] The fatal flaw in plaintiff's case is not her claim to suffer from MCS, but the complete lack of proof that the behavior found unacceptable by her superiors was "related to or a manifestation of the disability." Pltf. Memorandum at 6. Plaintiff has neither adduced nor proffered any evidence, nor pointed to anything in the record, that would establish that her disabilities caused her behavioral problems.

Plaintiff has attempted to construct an argument to the effect that, as a disabled person, she is more sensitive to what she perceives to be intolerable risk factors in the workplace, so that the seeming insensitivity to these factors by defendant (and

2. The question is much in doubt, however: Two district courts have rejected MCS as a recognized disability, *Summers v. Missouri Pac. R.R. Sys.*, 897 F.Supp. 533, 535–38 (E.D.Okla.1995); *Bradley v. Brown*, 852 F.Supp. 690, 700 (N.D.Ind.1994) ("[T]he 'science' of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a fact-finder, jury or judge."). Plaintiff has cited no case supporting her position. Even if plaintiff does suffer from MCS, and MCS is a recognized disability, this Court notes plaintiff's concession that she participates in recreational activities, including teaching a swimming class, which has been held by courts in other circuits to be evidence *undermining* a disability claim founded on a respiratory handicap, such as in the instant case. *See, e.g., Heilweil v. Mount Sinai Hospital*, 32 F.3d 718 (2d Cir.1994); *Byrne v. Board of Education*, 979 F.2d 560, 565 (7th Cir.1992); *Keck v. New York State Office of Alcoholism & Substance Abuse Servs.*, 10 F.Supp.2d 194, 200 (N.D.N.Y.1998).

others) only served to alienate her and make her less cooperative in her dealings with her colleagues. The attempt is unsuccessful. It is true that uncooperative behavior exhibited by an employee in response to discrimination (e.g., a female employee's failure to cooperate because of the sexist attitudes of her male colleagues) cannot be used as a basis for adverse action against that employee, *see McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984). But plaintiff's behavioral problems transcend "failure to cooperate" and are completely lacking in any credible explanation supported by science or law. Defendant points out with some force that, even if plaintiff's novel argument were accepted, plaintiff has repeatedly conceded that she was not suffering from respiratory distress when the incidents alleged by defendant occurred. Thus, even if her behavior were a manifestation of her disability, she could not argue that the behavior *that resulted in her dismissal* was a manifestation of her disability.

*Prima facie Case—Religion Claim*

■ Plaintiff concedes that she was dismissed "because of her alleged conduct," Pltf. Memorandum at 4, and that defendant's decision to terminate her employment was made *before* she voiced her concerns about the office Christmas decorations. These concessions effectively dispose of plaintiff's claim of religious discrimination. Counsel nevertheless submits that religion was a factor—albeit a "minor factor"—in defendant's decision and that it was used to "reinforce" defendant's prior decision to terminate plaintiff. The assertion is unsupported in the record.[3]

*Employer's Proffered Nondiscriminatory Reason*

Even if plaintiff had succeeded in making out a *prima facie* case of discrimina-

tion, she has put forward no evidence to demonstrate that defendant's proffered nondiscriminatory reason for her dismissal—that her behavior and her inability to interact well with her professional colleagues—is pretextual.

\* \* \* \* \* \*

An appropriate order accompanies this memorandum.

### ORDER

For the reasons set forth in the accompanying memorandum, it is this 29th day of March 2000,

**ORDERED** that defendant's motion for summary judgment [# 13] is **granted.** It is

**FURTHER ORDERED** that plaintiff's motion for summary judgment [# 9] is **denied.**

---

3. Plaintiff's contention that her termination "was infected by her religion" cites a deposition fragment. Pltf. Memorandum at 8 (Transcript at 142–43). Mr. Brannen, her immediate supervisor, stated that "Plotkin's questioning of the Christian Christmas material was just another incident that was part of the overall pattern." She also refers to an admittedly "tangential" reference in a two-page listing of termination reasons provided by the EEO. Neither reference supports her position, nor do the two taken together.